UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

UNITED STATES OF AMERICA,

        Docket No. 07 CR 429 (ADS)

     -against-

VARSHA MAHENDER SABHNANI and
MAHENDER MURLINDER SABHNANI,

      Defendants.

-------------------------------------------------------------X


# MEMORANDUM OF LAW IN SUPPORT OF
## THE DEFENDANT MAHENDER SABHNANI'S MOTION FOR A
## JUDGMENT OF ACQUITTAL PURSUANT TO F.R.C.P. RULE 29 (c)


SCARING & BRISSENDEN, PLLC
Counsel for Mahender Sabhnani
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

## TABLE OF CONTENTS

**PRELIMINARY STATEMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   P. 1

**FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   P. 2

**LEGAL ARGUMENT** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   P. 6

**A.** **The Evidence Adduced at Trial Was**
**Insufficient to Prove that Mahender Sabhnani**
<u>**Participated in the Crimes of Forced Labor and Peonage**</u> . . . . . . . . . . . . .   P. 6

    1. The Evidence at Trial Does Not Support
       the Inference That Mahender Sabhnani
       Was Aware Of His Wife's Criminal Conduct . . . . . . . . . . . . . . . . . . .   P. 9

    2. In Any Event, Mere Knowledge is Insufficient
       to Support Mahender Sabhnani's Conviction
       in the Absence of Evidence that He Acted
       Purposefully and With the Specific Intent
       to Commit the Crimes of Peonage and Forced Labor . . . . . . . . . . . . .   P. 13

    3. Mahender Sabhnani's Conviction
       on the Substantive Counts Cannot Be . . . . . . . . . . . . . . . . . . . . . . . . .   P. 20
       Justified By His Alleged Failure To Intervene

**B.** **The Evidence Adduced at Trial Was**
**Insufficient to Prove that Mahender Sabhnani**
<u>**Participated in the Crime of Document Servitude**</u> . . . . . . . . . . . . . . . . . . .   P. 24

**CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   P. 26

## PRELIMINARY STATEMENT

Under the highly unusual facts and circumstances of this case, we are submitting the instant brief to urge the Court to set aside Mahender Sabhnani's conviction with respect to Counts 1, 2, 3, 7, 8, 9, 10, 11, and 12 of the Superceding Indictment. The evidence adduced in this case was unequivocal with respect to Mahender Sabhnani. Both Samirah and Enung testified that, over a period of more than five years, Mahender Sabhnani was *never* present to witness his wife's alleged abuse of the maids. Moreover, Samirah and Enung testified that Mahender Sabhnani was a "nice" and "good" man, who never abused, threatened or intimidated either maid. Because they were unable to speak English or Indian, the maids testified that they were unable to communicate with Mahender, to ask for medical care, their passports, or to return home. Nevertheless, Enung opined that if she *had* asked Mahender for permission to return home, he would have allowed her to do so.

As a result, with respect to the Peonage and Forced Labor Counts, the evidence at trial utterly failed to establish: (1) that Mahender Sabhnani was even aware of his wife's alleged abusive conduct, or (2) in the alternative, that he sanctioned or participated in such mistreatment as a means to obtain the maids' services. While the Government has argued that Mahender Sabhnani should have been able to discern that "something was wrong", it is well established that a defendant's mere knowledge of criminal activity, his presence at the scene of a crime, or his association with a guilty party, is insufficient to create criminal liability. Prosecutors in the instant case were obligated to prove beyond a reasonable doubt, not merely that Mahender Sabhnani became aware of Varsha's alleged rages and bizarre punishments, but that he "participated" in such misconduct as something that he sought to bring about in order to obtain the maids' labor. The record here is utterly devoid of any indication that Mahender Sabhnani controlled or even sanctioned his wife's alleged

1

mistreatment of the maids, much less that he did so with the criminal intent to violate the Peonage

or Forced Labor statutes.  To the contrary, the Government's own evidence tends to demonstrate:

1) that Varsha Sabhnani's alleged abusive conduct always took place outside of her husband's

presence; and 2) that Varsha Sabhnani sought to hide her misconduct from her husband.  Given this

evidence, there was simply no basis from which one could infer Mahender Sabhnani's participation

in such a criminal partnership.  Put another way, the Government failed to produce any evidence that

he possessed the requisite specific intent to commit the crimes of Forced Labor and Peonage.

The Court should likewise reject the Government's backup argument – that Mahender

Sabhnani is criminally culpable because he "allowed" the alleged abuse to take place.  Because the

law does not recognize an affirmative duty to intervene, and because there is no evidence of

purposeful conduct undertaken by Mahender Sabhnani in furtherance of the charged crimes, his

conviction on Counts 1,2, 3, 7, 8 and 9 should be overturned.

Finally, because the Defendant lacked the specific intent to violate 18 U.S.C. §§ 1581 and

1589 -- the Peonage and Forced Labor statutes, and because such criminal intent is a necessary

element under 18 U.S.C. § 1592, Mahender Sabhnani's conviction with respect to the Document

Servitude Counts must also be set aside.

## **FACTUAL BACKGROUND**

On May 15, 2007, Mahender Murlidhar Sabhnani was arrested along with his wife, Varsha

Sabhnani, based upon the couple's alleged mistreatment of two domestic servants, Samirah and

Enung.  On September 18, 2007 the Government filed its Superceding Indictment in the instant case,

charging both defendants with: (1) Conspiracy to Commit Forced Labor; (2) Forced Labor as to

Samirah; (3) Forced Labor as to Enung; (4) Conspiracy to Harbor Aliens; (5) Harboring Aliens as

2

to Samirah; (6) Harboring Aliens as to Enung; (7) Conspiracy to Commit Peonage; (8) Peonage as to Samirah; (9) Peonage as to Enung; (10) Conspiracy to Commit Document Servitude; (11) Document Servitude as to Samirah; and (12) Document Servitude as to Enung.

In support of its various conspiracy counts, the Government alleged that the defendant Varsha Sabhnani had perpetrated numerous overt acts, including acts of violence against both Samirah and Enung.  As to Mahender Sabhnani, however, the Government alleged merely that: (1) he had traveled with his wife to pick up Samirah and Enung from JFK International Airport; and (2) that he had helped his wife search for Samirah when she went missing in May of 2007.

Consistent with the allegations set forth in the Indictment, the evidence at trial showed that Mahender Sabhnani *never* abused or threatened Samirah or Enung in any fashion.  In fact, during direct examination both maids independently and repeatedly characterized Mahender Sabhnani as "nice" or "good."  TR 1846; 1847-48; 2052; 3402; 3487.  More importantly, both Samirah and Enung testified that the abuse allegedly perpetrated by Varsha Sabhnani *always* took place outside of Mahender's presence.

Hence, Samirah testified that when she was beaten by Varsha Sabhnani "[i]t was on the bottom floor and it was the bathroom and it was locked.  And then no one could hear, and only the missus and I."  TR 1776.  "It would happen downstairs, in the downstairs bathroom, *so the mister wouldn't hear that*."  TR 2189 (emphasis added).  Likewise, Samirah testified that when she was "pinched" by Varsha Sabhnani, it took place in the downstairs bathroom and that *"No one was there except for the missus and me."*  TR 1794 (emphasis added).  Similarly, Enung testified that when she overheard Samirah being beaten in the downstairs bathroom , Mahender was driving the children to school.  TR 3192.  *"The Mister didn't know it."*  TR 3193 (emphasis added).

Samirah also testified that Mahender Sabhnani was not present when Varsha Sabhnani pricked her face (TR 1777; *see also* 3131), and that likewise, "when she pulled my ears, the mister was never there. *The mister didn't know about it.*" TR 1785 (emphasis added). Significantly, Samirah testified that Varsha forced her to wear a hat at all times to hide her ear injuries. "Everyday I had to wear it so to conceal my ears *so that mister couldn't see it*, the children couldn't see it." TR 1801 (emphasis added).

The maids further testified that Mahender was *not* present during the alleged "milk incident" (TR 1800), or when she was burned with hot water.   TR 1807, 1808; 3182.  Both Samirah and Enung testified that he was not there when Samirah was forced to strip naked or was taped (TR 1870; 3151; 3159).  Likewise, Enung testified that Mahender was not present when Samirah was forced to eat hot peppers (TR 3239; 3241) and the Government offered no evidence that he was otherwise aware of the practice.

Furthermore, Enung testified that Mahender Sabhnani was not aware of the verbal threats being made by Varsha.

> Every time she would talk to us, she threatened us to be killed. The one's going to get killed because of hit. That was Sami. The other one is going to get killed because of sadism. I don't know what she meant by sadism. But the Mister didn't know. The Missus is so bad.

TR 3576.

In this regard, both maids testified that Mahender Sabhnani was never verbally abusive or threatening.  Samirah testified that "[t]he mister never say anything." TR 1812.  Similarly, Enung told the jury that "he wouldn't hit me, he wouldn't get mad.  And that the worst he did was just go, go goes to bed, go . . . didn't hit, didn't get mad.  Better off just walking away.  Because when he

asked us to do anything, if we didn't understand that, because he only speak English and Indian, so he would just go ahead and get it himself. He would often just go ahead and fetch it himself." TR 3488.

Finally, both maids stated that they were unable to communicate with Mahender because of the language barrier. TR 1883; 2370. In fact, Enung testified that she and Sami never went *near* the mister. TR 3465. As a result, Samirah and Enung testified that they never asked Mahender for their passports, for permission to return home, or to visit the doctor. TR 1887; 2023; 3465. Even so, Enung testified that "If I was going to ask to go home, I'm sure that the mister would let me because mister is a good person." TR 3403, 3466.

Despite this testimony, the Government argued that Mahender Sabhnani was nevertheless culpable for his wife's alleged misconduct as a conspirator and as an aider and abetter. In particular, the Government pointed to Samirah's testimony that Mahender Sabhnani had seen her swollen face before she left (TR 2082), had seen her wearing rags in the house (TR 1791; 2367), had seen her working in wet clothing (TR 1823), and eating from the garbage. TR 1849. In addition, the Government argued that the Jury could infer Mahender's guilt from his close relationship with Varsha, because he benefitted from the maids' services, and because his business generated the income which was ultimately used to pay the maids' salaries. TR 4661; 4694. Finally, the Government argued that even if Mahender Sabhnani did not affirmatively assist Varsha Sabhnani in the commission of the charged crimes, he was legally culpable because he had failed to assist the maids, in violation of an affirmative duty to act. TR 4693.

At the close of the trial, this Court denied Mahender Sabhnani's Rule 29 Motion with Respect to the Harboring Counts (Counts Four though Six) but reserved decision as to the remaining

5

counts. TR 4294. Following three days of deliberation, the Jury convicted Mahender Murlidhar

Sabhnani on all counts charged in the Indictment.

## LEGAL ARGUMENT

**A.** **The Evidence Adduced at Trial Was Insufficient to Prove that**
**Mahender Sabhnani Participated in the Crimes of Forced Labor and Peonage**

Counts 1, 2, 3, 7, 8 and 9 of the Superceding Indictment all required the Jury to find that

Mahender Sabhnani utilized, or agreed to utilize, some type of threat or physical force in order to

obtain the labor and services of Samirah and Enung. Hence, 18 U.S.C. § 1589 makes it a crime to

obtain labor and services through: (1) threats of serious harm or physical restraint; (2) a scheme,

plan, or pattern intended to make the victim believe that non-performance would result in serious

harm or physical restraint; or (3) the abuse of law or the legal process.

Likewise, with respect to the Peonage Counts, the Jury was required to find that Samirah and

Enung were held in a condition of involuntary servitude by use of force, physical violence,

intimidation or other compulsion. *See* 18 U.S.C. § 1581. In particular the Jury was instructed that,

in order to convict either defendant on the substantive Peonage counts:

> it is necessary to prove that the defendant you are considering knowingly and
> willfully took action by way of force, threats, intimidation, or other forms of
> coercion, including physical coercion, or the threat of coercion through the law or
> legal process, causing the victim to reasonably believe that she had no way to avoid
> continued service.

TR 5095.

Because it was not alleged that Mahender Sabhnani had personally assaulted, restrained,

threatened, or intimidated either Samirah or Enung in any manner, the Government pursued his

conviction on the substantive counts under an aiding and abetting theory. In particular, it argued that

6

the Jury could *infer* that Mahender Sabhnani was aware of and approved of his wife's actions, even though such actions took place entirely outside of his presence.   As this Court instructed the Jury:

> In order to aid or abet another to commit a crime, it is necessary that the defendant willfully and knowingly associate herself or himself in some way with the crime and that she or he willfully and knowingly seek by some act to help make the crime succeed.

> Participation in a crime is willful if action is taken voluntarily and intentionally or in the case of a failure to act with the specific intent to fail to do something the law requires to be done, that is to say, with a bad purpose either to disobey or to disregard the law.

> The mere presence of a defendant where a crime is being committed, even coupled with knowledge by the defendant that a crime is being committed, or the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is not sufficient to establish aiding and abetting.  An aider and abettor must have some interest in the criminal venture.  One who has no knowledge that a crime is being committed or is about to be committed but inadvertently does something that aids in the commission of that crime is not an aider and abettor.  An aider and abettor must know that the crime is being committed and act in a way which is intended to bring about the success of the criminal venture.

TR 5035-5036.

We respectfully submit that under the facts and circumstances of this case, the evidence adduced was simply insufficient to permit any reasonable Jury to infer, beyond a reasonable doubt, that Mahender Sabhnani conspired with his wife to violate 18 U.S.C. §§ 1589 or 1581, or that he aided and abetted her in the commission of such crimes.

While it is true that both Samirah and Enung testified at length regarding Varsha Sabhnani's alleged threats and abusive conduct, there was no credible evidence to support the inference that Mahender was aware of such conduct, much less that he sanctioned it as a means of obtaining the maids' services. To the contrary, the maids' testimony strongly suggested that Varsha Sabhnani took active steps in order to hide her alleged misconduct from her husband.  Hence, the testimony at trial

7

revealed that Mahender was *never* present while Varsha was allegedly abusing the maids. TR 1776; 2189; 1794; 3193; 1785.   This fact is extremely significant, and can hardly be considered coincidental, given the alleged frequency of such incidents over a period of more than five years.

Indeed, both maids testified that when Samirah made a mistake in the evening, when Mahender was present, Varsha would take no immediate action, but rather would wait until the next morning when her husband was not there. "The next morning the punishment came." TR 1820; 3126. Likewise, when Mahender allegedly saw Samirah eating from the trash, and described this conduct to his wife, Samirah was not beaten by Varsha until after Mahender had "went away already." TR 1855.

Furthermore, Samirah repeatedly testified that Varsha beat and pinched her in the basement bathroom "*so the mister wouldn't hear that.*" TR 2189; *see also* TR 1794. Indeed, Enung testified that although she lived in the Sabhnani's home for two years, she only heard Samirah being beaten in the bathroom when she snuck downstairs to "eardrop." TR 3192. Notably, Enung testified that Mahender Sabhnani was out of the house, driving the children to school when this occurred. "*The Mister didn't know it.*" TR 3193 (emphasis added).

As to the sores behind Samirah's ears -- probably the most significant injury suffered by either maid - - Samirah testified "*when she pulled my ears, the mister was never there. The mister didn't know about it.*" TR 1785 (emphasis added). In fact, Samirah testified that Varsha forced her to wear the winter hat in order to conceal these injuries from Mahender, and that Varsha became very upset if Samirah took the hat off, even while sleeping. TR 1801; 2337.

All of this testimony is significant for two reasons. First, it raises the troubling question of whether Mahender Sabhnani was *even aware* of his wife's alleged criminal conduct. In our view,

8

his conviction should be set aside because the evidence supporting his knowledge of threats and/or abuse was equivocal at best.  Second, the evidence goes directly to the question of Mahender Sabhnani's supposed role as a co-conspirator and an aider/abettor.  Even if this Court determines that the evidence was sufficient to support an inference that Mahender became aware of some portion of his wife's conduct, mere knowledge is not sufficient to sustain his conviction, if he did not adopt and endorse such abuse as a means of obtaining the maids' labor.  In this regard, the testimony at trial raises an obvious and disturbing question: *why would Varsha Sabhnani hide her conduct from Mahender Sabhnani, if he was in fact, an aider and abettor or co-conspirator?*

Accordingly, and as set forth in greater detail below, Mahender Sabhnani's conviction on Counts 1, 2, 3, 7, 8 and 9 of the Superceding Indictment should be set aside because: (1) the evidence at trial was insufficient to prove, beyond a reasonable doubt, that Mahender Sabhnani knew that his wife was abusing or threatening Samirah and Enung; (2) because the evidence at trial was insufficient to show that he acted wilfully and with the specific intent to commit the crimes of Peonage and Forced Labor; and (3) because the evidence at trial was insufficient to support his conviction under a "failure to act" rationale.

1.      The Evidence at Trial Does Not Support the Inference
        That Mahender Sabhnani Was Aware Of His Wife's Criminal Conduct

Despite the unequivocal testimony that Mahender Sabhnani was never present while the maids were being threatened or abused, the Government has argued that the Jury could infer his knowledge based upon Samirah's testimony that Mahender had seen facial swelling.  In particular, the following testimony was elicited by the Government:

> When the Missus hit me, the Mister usually not there, so the Mister, he doesn't know.
> But the Mister would see me swollen - -

9

TR 2063.

------------------------------

Q:    Did Mahender Sabhnani see your face swollen like that on the day before you
      ran away?

A:    The mister saw that, even the kids saw that.

TR 2082.

The problem with this testimony is that it represents Samirah's subjective account of what
she believes that Mahender *must have* seen. In that regard, it is little better than conjecture. Notably,
testimony from other witnesses who saw Samirah in and around the same time suggest that her facial
injuries were *not* as obvious as the Government would have had the Jury believe.

In particular, Mohammed Zakaria testified that he saw Enung and Samirah in 2007 and saw
no signs of injury.[1] TR 4083. Likewise, James Colletti testified that he saw Samirah the Friday
before the Sabhnani's were arrested - on May 11, 2007. This of course, would have been the day
before Samirah ran away.[2] Mr. Colletti testified that he observed no injuries. TR 4124. Moreover,
while he did testify that Samirah appeared "generally" as she did in the hospital photographs, he did
not think her appearance was indicative of any type of injury. TR 4130.

Even more telling, the Government's own witnesses failed to observe the facial injuries
which the prosecutors claimed were so pronounced. In particular, Deborah Litras, who testified at
length about the injuries she was shown behind Samirah's ears, *never* testified that she observed or

---

[1] According to the testimony of Enung, Mohammed Zakaria saw Samirah as late as April
of 2007. TR 3342.

[2] In his rebuttal summation, AUSA Lesko grossly misrepresented Colletti's testimony, by
claiming that Colletti had testified that he saw Samirah on Sunday, May 13th. AUSA Lesko
pointed out that this was impossible, and argued to the Jury that Mr. Colletti was therefore
clearly lying. TR 4958. In fact, Colletti *never* testified that he saw Samirah on May 13th.

noticed bruising on the maid's face.  *See* TR 3802-3973.  Likewise, Samirah's medical records, introduced as Government Exhibit 20, do not record any indication of facial contusions or bruising.  *See* GX 20, Skin Integrity Report at p. 390.  In fact, Dr. Ami Attali, while reviewing the blown up photograph of Samirah's face (GX 320), testified that "it did not appear that there was any signs of swelling." TR 2863.  Although he did testify as to the presence of various marks and/or healed scars on her face, he was unable to identify the age or cause of those marks.

Finally, the Government's argument notwithstanding, the evidence at trial suggested that Mahender Sabhnani *did not* spend much time in close proximity to the maids.  In particular, on cross examination, Enung testified as follows:

> Q:    And it's true isn't it that neither you nor Sami ever went near the mister? Isn't that true?
>
> A:    Never.
>
> Q:    You and Sami did not go near the mister.  Isn't that true?
>
> A.    Never did.
>
> Q:    And Sami never did, either.  Correct?
>
> A:    Never Did.

TR 3465.

Given the fact that numerous witnesses – including Deborah Litras – failed to observe anything unusual about Samirah's face, and the testimony that Samirah did not "go near" Mahender, there is simply no compelling evidence to support the Government's contention that he "must have" seen swelling in and around her face.  Moreover, it is worth noting that although Deborah Litras worked in the Sabhnani house five days a week during the entire relevant period, and although she

11

arrived each day at 6:30 a.m., she did not testify that she overheard screaming, yelling, or any other sounds indicative of abuse. *See* TR 3804-3807. Hence, the Government cannot argue that Mahender Sabhnani, who was working in the same office, would have necessarily heard the abuse which was allegedly taking place in the adjacent house.

In the alternative, the Government has argued that Mahender's knowledge can be inferred through testimony that he observed Samirah engaged in unusual behavior, such as wearing rags, urinating on the floor, and eating from the trash. In summation, the Government argued that based upon this behavior, Mahender Sabhnani must have known that "something was wrong."

> It is happening in your house. And if you saw Samirah every day looking like that, serving your kids breakfast, cooking your food, cleaning your house, you would know something is wrong. She is a 50 year old grandmother, and she is urinating in your house. And don't tell me he didn't find out about that. You know something is wrong. She is in your house for five days, every single day. And you don't know that something is wrong?

TR 4694.

The relevant inquiry, however, is not whether such behavior was sufficient to indicate that "*something* was wrong", but whether it was sufficiently clear to place Mahender Sabhnani on notice that his wife was employing threats and abusive practices against the maids outside of his presence. In other words, the Government must show that Mahender Sabhnani knew that his wife was using one of the methods *specifically* proscribed under 18 U.S.C. §§ 1589 or 1581 in order to compel Samirah and Enung to work (and that he acted with the intent to further that aim). Knowledge that the maids labored under poor or difficult working conditions, or that they were paid insufficient sums, is not enough under those statutes.

In any case, the evidence in this regard was equivocal at best. For the most part, the

12

anecdotes relied upon by the Government represented isolated incidents that would not clearly convey to any reasonable person the nature of the crimes that were allegedly being committed by Varsha Sabhnani behind closed doors.[3] *See United States v. Cruz*, 363 F.3d 187, 197-198 (2d Cir. 2004) (defendant's cognizance of "suspicious circumstances" was not sufficient to support his conviction for aiding and abetting.) This is especially true given the language barrier which existed between the maids and Mahender - the maids were literally incapable of describing to him what occurred outside his presence, and Mahender was incapable of inquiring. Instead, the evidence suggests that Mahender Sabhnani relied upon his wife to explain and interpret the events he witnessed.

While one may conclude, with the benefit of objective distance and hindsight, that Mahender Sabhnani should have made additional inquiries, or taken a more active role in seeing to the maids' well-being, as discussed below, his failure to do so does not render him guilty under the Forced Labor or Peonage Statutes. *See Section 3 infra.*

2.      In Any Event, Mere Knowledge is Insufficient to Support Mahender
        Sabhnani's Conviction in the Absence of Evidence that He Acted Purposefully
        and With the Specific Intent to Commit the Crimes of Peonage and Forced Labor

Even if the Court determines that the evidence adduced at trial is nominally sufficient to infer that Mahender Sabhnani knew that his wife was mistreating Samirah and Enung, such knowledge, standing alone, is not sufficient to justify Mahender Sabhnani's conviction under the law.

---

[3] Despite the Government's suggestion that Samirah wore rags "every day", Enung testified that in fact, Samirah only wore "rags" subsequent to March of 2007 - approximately 2 months before she left. TR 3196. Moreover, witnesses who saw Samirah during this time period testified that she was not wearing the garments introduced into evidence as GX 1E and 1B. *See* TR 4083 and 4125. Notably, even Deborah Litras, who described Samirah's clothing as "messy looking . . . sort of like torn or tattered type clothing", did not identify the dramatic, shredded rags introduced as GX 1E and 1B. TR 3834.

13

It is well established that both Conspiracy and Aiding and Abetting are specific intent crimes, which require the Government to prove that the defendant acted with a specific intent to violate the substantive statue. *United States v. Samaria*, 239 F.3d 228, 234-235 (2d Cir. 2000) (evidence was insufficient to show that the defendant knowingly and intentionally participated in conspiracy or substantive offenses). As the Second Circuit has repeatedly emphasized:

> in order to be an aider and abettor the defendant must associate himself with the venture in some fashion, participate in it as something that he wishes to bring about, or seek by his action to make it succeed . . . The rule is similar with respect to establishing membership in a conspiracy . . . Absent evidence of such purposeful behavior, mere presence at the scene of the crime, even when coupled with knowledge that at that moment a crime is being committed is insufficient to prove aiding and abetting or membership in a conspiracy.

*United States v. Johnson*, 513 F.2d 819, 823 (2d Cir. 1975) (internal citations omitted).

In *Johnson*, the Court of Appeals held that the defendant Johnson's presence in a car carrying methamphetamines across the border was not sufficient to sustain his conviction on conspiracy or aiding and abetting charges, even when coupled with evidence of a longstanding relationship between Johnson and the driver of the car, and false exculpatory statements made by Johnson.

This logic extends to the situation where a joint occupant of a residence becomes aware that a crime is being committed in his home. Hence, in *United States v. Soto*, 716 F.2d 989 (2d Cir. 1983), the evidence adduced at trial proved that the defendant Soto had been living for approximately one month in an apartment which also served as a "narcotics cutting mill." During undercover operations, the defendant was observed in the apartment while several handguns and drug paraphernalia were in plain view. When police raided the apartment she was found sleeping in the room where the drugs were cut. A search of the room revealed narcotics, paraphernalia, and a weapon. Moreover, the evidence showed that Soto benefitted from the narcotics conspiracy,

14

insofar as her rent was paid by the individual in charge of the cutting operation. *Id.* at 990.

Once again however, the Second Circuit overturned the conviction, holding that the defendant's mere presence at the apartment - even coupled with her obvious knowledge of the drug cutting operation - was not sufficient to establish her membership in the conspiracy.   In doing so, the Court noted that:

> while the evidence need not have excluded every possible hypothesis of innocence, nevertheless, where the crime charged is conspiracy, a conviction cannot be sustained unless the Government establishes beyond a reasonable doubt that the defendant had the specific intent to violate the substantive statutes. The Government here produced no evidence whatever linking defendant to the conspiracies. Instead, we believe that on the basis of association alone, the jurors let their imaginations run rampant.

*Id.* at 993, *internal citations omitted.*

Likewise, in the case *United States v. Valenzuela*, 596 F.2d 824 (9th Cir. 1979) the Ninth Circuit held that a wife's presence in a home used to process and distribute heroin was insufficient to support her conviction on possession and conspiracy charges.   In particular, the Court held that the "mere joint occupancy of the house is at best equivocal, and is not alone sufficient to support" a defendant's conviction on conspiracy charges. *Id.* at 830-831 . *See also United States v. Gaviria*, 740 F.2d 174, 184 (2d Cir. 1984) (defendant's presence in apartment coupled with knowledge of drug operation insufficient to establish membership in conspiracy); *United States v. Cruz*, 363 F.3d 187, 197-200 (2d Cir. 2004) (conviction under aiding and abetting theory "must be premised upon something more than evidence of a general cognizance of criminal activity."); *United States v. Young*, 745 F.2d 733, 764 (2d Cir. 1984) (evidence did not support conviction of defendant's daughter on narcotics conspiracy charge).

In the instant case, the Court should set aside Mahender Sabhnani's conviction with respect

15

to Counts 1, 2, 3, 7, 8 and 9 because the evidence of joint occupancy is equivocal at best.  In particular, there is simply no evidence that he supported, encouraged or sought to participate in his wife's alleged misconduct *vis-a-vis* the maids, or that such misconduct was carried out pursuant to a *joint* conspiracy to obtain the maids' services.  In this regard, it is important to note that the Government was required to prove that Mahender Sabhnani *specifically* understood that his wife was engaged in the crimes of Peonage and Forced Labor.  A general cognizance that she was engaged in *some type* of criminal conduct – such as simple assault – is not sufficient.  *See United States v. Cruz*, 363 F.3d 187,197-200 (2d Cir. 2004) (individual who accompanied co-defendant to "watch his back" was not guilty of aiding and abetting in the distribution of heroin, where he was not specifically aware that criminal transaction involved heroin).

In fact, while the Government has labored mightily to pigeonhole the facts of this case into the legal framework of the forced labor and/or peonage statutes, the evidence adduced at trial painted the picture of an entirely different type of crime.  The evidence at trial, regarded in the light most favorable to the Government, depicted a woman who was prone to unpredictable rages, inflicting a series of bizarre and senseless punishments on her maids for no particular purpose, while seeking to hide her conduct from her husband.

The Government's gloss not withstanding, it is evident that the abuse alleged at trial was *not* carried out as part of a joint plan between husband and wife for the purpose of "obtaining the labor and services" of Samirah and Enung.  To the contrary, both Samirah and Enung testified that prior to being subjected to Varsha's abuse, they were willing and eager to work in the United States.  *See* TR 1716-1717; 1722; 3442-3443.  Under these circumstances, the abuse allegedly doled out by Varsha Sabhnani served no conceivable purpose.  As described by the victims themselves, the

16

alleged punishments inflicted by Varsha Sabhnani were random, senseless and entirely gratuitous. Hence Samirah told the jury: "there was nothing wrong with my work.  But missus always punish me."  TR 1760.

Asked by prosecutors why she was forced to wear glasses covered by tape, or why she was stripped naked and covered with tape, Samirah expressed bewilderment.  "I don't know.  The point is every day I was punished – every day I was punished."  TR 1780.  Likewise, Enung testified that although she was sometimes required to ask for Varsha's forgiveness, "The mistake was really minor.  Sometimes I would help Sami.  The Missus would not let me do that."  TR 3049.

Bizarrely, Samirah testified that she was frequently punished for doing work without Varsha's permission.  TR 1767; 1827.  Enung testified that Varsha intentionally withheld such permission in order to "confuse" the maids.  "If you want permission, Sami would approach her - would approach the missus and then the missus would pretend like she was laying down sleeping and then turn around."  TR 3125.

Similarly, Samirah described how she was required to bring Varsha two glasses of water every ten minutes, which Varsha would then refuse to drink.  "I was told to bring two glasses of water.  She didn't drink from it and she drank only water brought in from Enung.  And mine, she didn't drink from my glass."  TR 1824.

Q:      What did the missus do with the water that you brought her?

A:      That is punishment so that I cannot go to work, so that I got more punishment.

TR 1825.

If such testimony is to be credited, then it seems clear that Varsha Sabhnani's alleged conduct was not motivated by a desire to obtain labor and services (which Samirah and Enung were already

17

willing to provide), but by something more akin to sadism.   The bizarre punishments and rages described by the maids, which <u>always</u> took place outside of Mahender's presence - the alleged beatings and cuttings, forcing Samirah to strip, shaving her pubic hair, taping her naked body - clearly did not originate from any sort of rational plan subscribed to by Mahender Sabhnani.

Nevertheless, the Government has argued that the Jury could infer Mahender's culpability because, it claims, he benefitted from his wife's conduct.  In particular, prosecutors argued that the torture inflicted outside of his presence allowed him to enjoy the maids' cheap labor:

> And why didn't he beat them?  Because he didn't have to.  He didn't have to beat them. His wife did all the dirty work for him.  And he was allowed to enjoy the fruits of their crimes – the cheap labor, the unquestioning labor, day in and day out, of the servants in his huge house.

TR 4690.

While this argument may have resonated with the Jury on an emotional level, it does not withstand logical scrutiny, given the fact that both maids were already willing to work for a very minimal salary (by U.S. standards), and certainly without the added inducement of being tortured. Why would Mahender Sabhnani sanction such conduct?   To what end?   If anything, Varsha Sabhnani's alleged mistreatment of the maids was counterproductive, in that it impeded their ability and willingness to work.  As a result, the idea that Mahender Sabhnani *benefitted* from his wife's alleged misconduct simply does not stand to reason.

More importantly, if Mahender Sabhnani was indeed Varsha's partner in crime, why would Varsha only abuse the maids in his absence?  Why would she wait until he was gone to inflict her punishments?  And why would she seek to hide the maid's injuries from her husband?  Varsha Sabhnani's alleged conduct in this regard is particularly telling, because it provides invaluable

18

insight as to her mental state.  In particular, if one accepts the Government's version of events, Varsha Sabhnani's actions demonstrate that she *knew* that her husband – the "nice" and "good" man described by Samirah and Enung – would not approve of her abusive conduct.  As a result, it is abundantly clear from the evidence that there was no "agreement" between the two Defendants in this crucial regard.

To convict Mahender Sabhnani under the substantive or conspiracy counts, the Government was required to produce something more than evidence of his presence in the home, his association with Varsha Sabhnani, or even his awareness of her misconduct.  *To justify his conviction, the Government was obligated to prove beyond a reasonable doubt that Mahender Sabhnani acted with the specific intent to bring about the substantive crimes charged in the Indictment.*  In this regard, the maids' own testimony, their repeated descriptions of Mahender as "nice" and "good", completely undermines the Government's contention.  In particular, it is frankly impossible to square Enung's testimony - and her professed belief that Mahender would have permitted to her return home if only she had asked, with the Defendant's conviction under the Forced Labor and Peonage statutes, both of which require that the victim "reasonably to believe that she had no choice but to work or remain working for the defendant."  *See* Enung's testimony at TR 3403; 3466; Jury Charge at TR 5028, 5096.

Because the record in this case is utterly devoid of any evidence that Mahender Sabhnani undertook purposeful conduct in furtherance of the charged crimes, we respectfully submit that Mahender Sabhnani's conviction with respect to Counts 1, 2, 3, 7, 8 and 9 must be set aside.

19

3.   Mahender Sabhnani's Conviction on the Substantive
     Counts Cannot Be Justified By His Alleged Failure To Intervene

In the alternative, prosecutors have argued that even in the absence of purposeful conduct,

Mahender Sabhnani's conviction under the aiding and abetting statute can be justified if the

Government proved knowledge coupled with a *failure* to undertake affirmative action – *i.e.* "to do

something the law requires to be done."   This instruction was provided to the Jury, over the

Defendant's objection, and without any guidance as to the parameters of Mahender Sabhnani's

supposed duty. *See* Court's Instructions at TR 5053, Defendants' objection at TR 4427. As a result,

the Jury was essentially invited to postulate any "legal duty" it thought appropriate under the

circumstances. The Government wasted no time in framing that alleged duty as broadly as possible,

arguing that Mahender Sabhnani was culpable because he "let" the crime happen:

> Ask yourself this, ladies and gentlemen: who is worse?  The twisted soul who
> tortures the maid, or the man of the house who lets it happen.

TR 4690; *see also* TR 4693, 4696, 4978.

While this "duty to intervene" argument played powerfully to the Jury's moral sensibilities,

its legal grounding is considerably less certain.  In particular, it has long been recognized that the

"American rule" regarding a bystander's "failure to act" holds that there is generally no legal duty

to intervene or rescue another in danger, even though a moral obligation might exist.  This is true

even when aid could be rendered without danger or inconvenience to the potential rescuer.  Wayne

R. LaFave & Austin W. Scott, Jr., SUBSTANTIVE CRIMINAL LAW § 3.3 (1986).

Hence, while it is true that in the face of a well-defined legal duty, aiding and abetting

liability may stem from a failure to act, we are unaware of any authority in the Second Circuit which

holds that an individual has a legal duty to stop a family member from committing a crime.  To the

20

contrary, as this Court instructed the Jury, the mere acquiescence by a defendant in the criminal conduct of others, even with guilty knowledge, is insufficient to establish aiding and abetting liability. TR 5035.

Nevertheless, in support of its position, the Government has cited to the Fourth Circuit case *United States v. Bonetti*, 277 F.3d 441 (4th Cir. 2002), which bears at least a superficial similarity to the instant matter. In *Bonetti*, a husband (Bonetti) and his wife were accused of keeping a domestic servant (Dos Santos) in their home for fourteen years under "slavery-like" conditions. As in the instant case, Dos Santos testified that she had been subject to regular abuse from Bonetti's wife. Unlike the instant case however, the evidence of Bonetti's knowledge was unequivocal. In particular, Dos Santos had complained of the abuse to Bonetti, and in addition had requested medical attention on at least two occasions. The evidence showed that Bonetti had failed to protect the maid from his wife's abuse, or to provide her with medical care in a timely fashion. *Id.* at 445-446.

Unlike the instant case, *Bonetti was not charged with Document Servitude, Peonage, or Forced Labor.* Instead, he was charged with and convicted of Harboring and Conspiracy to Harbor. In addition, the jury (unlike the jury in the instant case) found that during the commission of that crime, Bonetti had caused serious bodily injury, subjecting him to an increased statutory minimum sentence under 8 U.S.C. § 1324(a)(1)(B)(iii). *Id.* at 446.

The relevant issue on appeal was whether the evidence at trial was sufficient to support the jury's finding that Bonetti had caused serious bodily injury in connection with the Harboring offense. In this regard, Bonetti argued that he had not caused any serious injury, because: (1) he was under no legal duty to prevent his wife from abusing the maid, and (2) because there was no legal duty to render medical assistance to a non-family member. *Id.* at 447.

21

Notably, as to Bonetti's first argument, <u>the Fourth Circuit did not hold that the defendant - husband was under a legal duty to "prevent his wife's actions."</u>  It did hold, however, that as a co-conspirator, he was legally responsible for her foreseeable acts of violence.  Given the fact that "Dos Santos repeatedly complained to Bonetti about his wife's abuse", the Court held that her actions were foreseeable in that regard.[4]  *Id.* at 447.

As to Bonetti's second argument however, the Fourth Circuit held that under the facts of that case, the husband-defendant *was* under a legal obligation to seek prompt medical care during two specific medical emergencies.  In particular, the Court pointed to testimony that Dos Santos had suffered a cut on her leg which subsequently became infected.  Although Dos Santos brought the injury to Bonetti's attention and asked to be taken to a doctor, he declined to do so until more than a year had past, and the injury had substantially worsened.  When she finally received treatment, Dos Santos was diagnosed with osteomyelitis – an acute bone infection – and was required to stay in the hospital for four days.  *Id.* at 446.

Second, the testimony at trial showed that while in Bonetti's employ, Dos Santo had developed a "cantaloupe-sized tumor" in her stomach.  Once again Dos Santo had specifically and repeatedly asked Bonetti to take her to a doctor, but Bonetti refused.  When Dos Santos ultimately received treatment, she was diagnosed with a uterine fibroid, and a hysterectomy was required to remove it.  *Id.*

As a result, the Fourth Circuit held that under the "extraordinary facts" of that case, where Bonetti had "created a circumstance of forced dependence", and where "Dos Santos repeatedly asked

---

[4]     We note that in the instant case, the Court properly declined to instruct the Jury that it could convict Mahender Sabhnani of Peonage or Forced Labor under a similar *Pinkerton* rationale.   TR 4629.

Bonetti to take her to the doctor for her stomach problems and her leg wound", "Bonetti may be held criminally liable for causing the injuries to Dos Santos' leg and stomach through his failure to seek prompt medical care." *Id.* at 448.

In assessing the applicability of *Bonetti* to the instant situation, it must first be noted that *Bonetti* did not address whether the "failure to provide medical treatment" could be the basis for aiding and abetting liability under the Forced Labor or Peonage statutes. The Fourth Circuit was instead addressing a much simpler question - whether Bonetti was legally responsible for injuries suffered by Dos Santos in the context of a sentencing enhancement. While it is one thing to argue that a person might be legally responsible for the foreseeable injury which results from a lack of medical treatment, it is quite a different thing to suggest that such an omission, standing on its own, could render a person guilty of the Federal crimes of Forced Labor and/or Peonage. We do not believe that such a inferential leap is warranted by the holding in *Bonetti*.

Moreover, even if this Court were inclined to make that leap, the facts and evidence adduced at trial clearly distinguish the instant case from *Bonetti*. To begin with, there was no evidence that either of the domestic servants in this case *ever* approached Mahender Sabhnani to obtain medical care. To the contrary, Samirah testified during direct and again on redirect examination that she *never* asked Mahender to take her to a doctor. TR 2023; 2369. Moreover, neither maid approached Mahender Sabhnani or drew his attention to a particular ailment. In fact, Enung testified that neither she nor Samirah typically "went near" Mahender Sabhnani. TR 3465. Finally, unlike *Bonetti*, there was no allegation that either maid suffered any serious or lasting injury *due to* a lack of medical care.

Again, while the Court may find that Mahender Sabhnani was under a *moral* obligation to take better care of persons who were living under his roof, to investigate incidents of strange

23

behavior, and to intervene in cases of mistreatment, the Court should be careful not to conflate such ethical obligations with criminal culpability.

Finally, it bears noting that, under the Court's instructions a failure to act does not give rise to criminal liability *unless* such an omission was accompanied by the specific intent to commit the crimes of Peonage and/or Forced Labor. *See* TR 5035. As we have argued at length *supra*, the record is devoid of any evidence that Mahender Sabhnani possessed such criminal intent.

**B.** **The Evidence Adduced at Trial Was Insufficient to Prove that Mahender Sabhnani Participated in the Crime of Document Servitude**

The evidence adduced at trial regarding document servitude was as follows: both maids testified that upon their arrival in the United States, Varsha Sabhnani took possession of their passports. TR 1747; 3047. Samirah testified that her passport was returned to her by Varsha Sabhnani two weeks before she left the Sabhnani residence, after it had already expired. TR 1749. Enung testified that she asked Varsha Sabhnani for her own passport, but that Varsha refused to return it. TR 3048-3049. When agents raided the residence on May 14, 2007, Varsha Sabhnani led them to Enung's passport, which was located in a locked cabinet in the bedroom closet of Varsha and Mahender Sabhnani, along with the Sabhnani's passports. TR 1048-1049.

Neither maid testified that Mahender Sabhnani ever personally confiscated or possessed any travel documents, or that he was present when the maids asked Varsha to return the passports. No evidence was adduced at trial that Mahender Sabhnani refused to return the passports or that he gave any indication to the maids that they would be prohibited from returning home. To the contrary, Samirah testified that she never broached the subject with Mahender (TR 1887), while Enung testified that "If I was going to ask to go home, I'm sure that the mister would let me because mister is a good person." TR 3403, 3466.

24

Based upon this record, the evidence at trial was plainly insufficient to support Mahender Sabhnani's conviction on Counts 10 through 12 of the Superceding Indictment. As this Court instructed the jury, 18 U.S.C. § 1592 required the Government to prove, beyond a reasonable doubt, three elements:

> First, that the defendant you are considering did conceal, remove, confiscate or possess an actual passport, visa, or other immigration documents of Jane Doe # 1, Samirah, as to Count Eleven; and Jane Doe # 2, Enung, as to Count Twelve;
>
> Second, that the defendant you are considering did these acts in the course of a violation of Title 18, United States Code Section 1581, the peonage statute, or 1589, the forced labor statute, with the intent to violate those statutes; and
>
> Third, that the defendant acted knowingly and intentionally.

TR 5115.

Mahender Sabhnani's conviction on Counts 10 through 12 should be set aside because, as set forth above, there was insufficient evidence to establish the second element – that he possessed the requisite specific intent to violate 18 U.S.C. §§ 1581 or 1589.

Moreover, the evidence was insufficient to establish the third element -- that Mahender Sabhnani acted knowingly and intentionally to confiscate or possess the maids' travel documents in furtherance of a crime. Although the Jury might have inferred that Mahender knew that the documents had been placed in the locked cabinet, this fact alone is not sufficient to establish knowing and intentional conduct on the part of Mahender Sabhnani. This is especially true because the maids' passport were kept together with the family's travel documents, an arrangement which on its face, would not have raised any red flags or seemed unduly suspicious to Mahender Sabhnani.

Hence, given the absence of any allegation that Mahender Sabhnani personally confiscated or concealed documents, and given Enung's testimony that Mahender would have permitted her to

25

return home if she had asked, there was simply no basis for the jury to conclude, beyond a reasonable doubt, that Mahender Sabhnani was guilty of conspiring to commit or committing the crime of document servitude.

## **CONCLUSION**

The question before this Court is *not* whether Mahender Sabhnani is legally culpable for employing and harboring illegal aliens within his home – an offense which, within its own right, carries a potentially substantial term of incarceration. *See* U.S.S.G. § 2L1.1. This Court has already determined that the evidence adduced at trial was sufficient to support his conviction on Counts 4 through 6 of the Superceding Indictment.

Nor is the question whether Mahender Sabhnani failed with respect to any number of *moral obligations* – such as the ethical duty to furnish the maids with a reasonable salary by U.S. standards, to arrange for regular medical check ups, or to affirmatively protect the maids from mistreatment.

The *only* question before the Court is whether the evidence adduced at trial, when considered in the light most favorable to the Government, was sufficient to prove beyond a reasonable doubt that Mahender Sabhnani, the individual, acted in a purposeful manner, and with the specific intent to bring about the crimes charged in Counts 1, 2, 3, 7, 8, 9, 10, 11, 12 of the Superceding Indictment.

At the end of the day, the Government's case against Mahender Sabhnani can be boiled down to two arguments: (a) he must have known that something bad was happening in his home, and (b) that he should have acted to prevent it. With all due respect, the law requires *more* than this in order to impose criminal liability on an individual, and to subject that individual to the particularly severe penalties which such liability necessarily entails under the Federal Sentencing Guidelines.

Although it is true that a defendant bears a heavy burden in challenging his conviction, it is

26

also true that when "the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt." *United States v. Glenn*, 312 F.3d 58, 70 (2d Cir. 2002).  As a result, "where a fact to be proved is also an element of the offense [such as intent], it is not enough that the inferences in the government's favor are permissible. [The court] must also be satisfied that the inferences are sufficiently supported to permit a rational juror to find that the element, like all elements, is established beyond a reasonable doubt." *United States v. Martinez*, 54 F.3d 1040, 1043 (2d Cir. 1995).

In the instant case, the Government's evidence was simply insufficient to establish, beyond a reasonable doubt, that Mahender Sabhnani engaged in any meaningful conduct or with the specific intent to commit the crimes of Forced Labor, Peonage, or Document Servitude.  As a result, and based upon the arguments set forth above, we respectfully urge this Court to set aside his conviction with respect to Counts 1, 2, 3, 7, 8, 9, 10, 11 and 12 of the Superceding Indictment.

Dated: Garden City, New York
      January 21, 2008

Respectfully Submitted,

SCARING & BRISSENDEN, PLLC

By: _____
Stephen P. Scaring
Counsel for Mahender Sabhnani
666 Old County Road, Suite 501
Garden City, NY 11530
516-683-8500

By: _____
Matthew W. Brissenden
Counsel for Mahender Sabhnani
666 Old County Road, Suite 501
Garden City, NY 11530
516-683-8500

27